# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**DENNIS R. BROWN**
**DENNIS H. GEISLEMAN**
Geisleman & Brown LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**KARL L. MULVANEY**
**NANA QUAY-SMITH**
**BRIANA L. CLARK**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

FILED

Sep 07 2012, 8:56 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

KENNETH W. SMITH and                )
DEB-ANNE SMITH,                     )
                                    )
    Appellants-Plaintiffs,          )
                                    )
        vs.                         )    No. 02A03-1201-CT-41
                                    )
DERMATOLOGY ASSOCIATES OF           )
FORT WAYNE, P.C. a/k/a DERMATOLOGY  )
& LASER SURGERY ASSOCIATES OF       )
FORT WAYNE, P.C.,                   )
                                    )
    Appellee-Defendant.             )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Stanley A. Levine, Judge
Cause No. 02D01-0902-CT-46

September 7, 2012

OPINION - FOR PUBLICATION

**KIRSCH, Judge**

Kenneth W. Smith ("Smith") and his wife, Deb-Anne Smith, (collectively "the Smiths") appeal from the trial court's findings of fact and conclusions thereon[1] after a bench trial on their medical malpractice claim against Dermatology Associates of Fort Wayne, P.C., a/k/a Dermatology & Laser Surgery Associates of Fort Wayne, P.C. ("DLSA").  The Smiths present two issues, which we consolidate and restate as follows:  Whether the trial court erred by concluding that the Smiths had failed to present sufficient evidence to invoke the doctrine of *res ipsa loquitur*.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Smith, who has suffered from psoriasis since the age of thirteen, sought medical treatment for his condition.  He became a patient of Dr. Alan R. Gilbert ("Dr. Gilbert"), a dermatologist employed by DLSA, in December of 1994.  As a new patient, Smith was evaluated by Dr. Gilbert, and a treatment plan was proposed.  Dr. Gilbert opined that Smith's psoriasis was generalized, severe in nature, and unpredictable given Smith's history.  In addition to testing and medication therapy, Smith underwent UVA radiation treatments for his flare-ups of psoriasis.

In particular, his treatment plan called for Smith to periodically receive Psoralen UVA ("PUVA") treatments.  Psoralen is a drug derived from a plant, which, in its oral form, becomes activated when a certain wavelength of light is administered to a patient who had previously taken Psoralen.  Psoralen is activated by UVA light, and a PUVA treatment is

---

[1] We commend the trial court on the thoroughness and clarity of its findings and conclusions thereon, which greatly facilitated appellate review.

administered through a light box. The amount of UV light used to dose a patient is determined by the patient's skin type, sensitivity to the sun, and the patient's reaction to the initial dose of the UVA light.

Smith received PUVA therapy using the light box at DLSA's Lake Avenue office in Fort Wayne. Smith underwent the PUVA treatments from December 28, 1994 through December 8, 2004, and received a total of 147 treatments from DLSA. The most recent treatments were administered on December 3, 2004, December 6, 2004, and December 8, 2004. When Smith would notice an outbreak of psoriasis occurring, he would contact DLSA to schedule a treatment. Smith responded well to the PUVA treatments. However, after his last treatment at 1:00 p.m. on December 8, 2004, Smith suffered UV burn injuries to approximately 84% of his body.

Although he returned to work after his last treatment, a few hours thereafter, he started to feel an irritation to his skin. He noticed his skin getting red and started to feel a burning sensation. Smith left work at approximately 6:00 p.m. and went to bed after going home. Smith continued to feel poorly, began shaking uncontrollably, and started to notice blisters on his body from his torso area down. Smith went to the emergency room and complained of pain. The emergency room physician noticed that Smith had a severe sunburn on approximately 85% of his body. Smith was transferred from the emergency room to the Burn Unit of St. Joseph Hospital in Fort Wayne.

Dr. Gilbert received a telephone call on December 9, 2004, from the Burn Unit at St. Joe's Hospital informing him that Smith had been admitted early that morning with first and second degree burns. Dr. Gilbert visited Smith at the hospital, but was not asked to assist in

Smith's treatment. Smith returned to work half days on December 14, 2004 and was released to return to work full time on December 15, 2004. By March of 2005, Smith's burns were completely healed.

On December 4, 2006, the Smiths filed a proposed complaint with the Indiana Department of Insurance alleging that Smith received care from DLSA that fell below the required standard of care, that was negligent, and that constituted malpractice. A medical review panel convened and, on October 20, 2008, rendered its decision that the evidence did not support the conclusion that DLSA failed to comply with the appropriate standard of care.

On February 6, 2009, the Smiths filed a complaint against DLSA alleging medical malpractice. In particular, the Smiths alleged that the negligence of the medical personnel or machine malfunction created a *res ipsa loquitur* inference that an act of malpractice may have occurred. On April 20, 2011, DLSA filed a motion for partial summary judgment, claiming that the Smiths did not establish either of the two required elements of *res ipsa loquitur*. More specifically, DLSA argued that the Smiths did not show that DLSA employees were in exclusive control of the ultraviolet exposure level from the PUVA machine or that the injuries Smith sustained could not have occurred without negligence. After the Smiths filed their response, the trial court denied the motion for summary judgment, finding the existence of genuine issues of material fact.

A three-day bench trial began on June 21, 2011. At the close of the Smiths' case-in-chief, DLSA made an oral motion for involuntary dismissal. The trial court took the motion under advisement and requested post-trial briefing on the issues raised by DLSA. On January 4, 2012, the trial court entered its findings of fact and conclusions thereon. The trial

court concluded that the Smiths had failed to establish that DLSA had exclusive control of the PUVA machine or that the injuries allegedly suffered by Smith would not have occurred without negligence. The trial court concluded that the doctrine of *res ipsa loquitur* was inapplicable and that the Smiths had failed to meet their burden of establishing by direct or circumstantial evidence that DLSA breached its duty of care. The trial court entered judgment in favor of DLSA. The Smiths now appeal.

## DISCUSSION AND DECISION

The trial court determined that the doctrine of *res ipsa loquitur* did not apply to allow the inference that an act of malpractice had occurred. The doctrine of *res ipsa loquitur* literally means "the thing speaks for itself," and we have stated the following about the doctrine:

> *Res ipsa loquitur* is a rule of evidence which permits an inference of negligence to be drawn based upon the surrounding facts and circumstances of the injury. The doctrine operates on the premise that negligence, like any other fact or condition, may be proved by circumstantial evidence. To create an inference of negligence, the plaintiff must establish: (1) that the injuring instrumentality was within the exclusive management and control of the defendant or its servants, and (2) that the accident is of the type that does not ordinarily happen if those who have the management and control exercise proper care. In determining if the doctrine is applicable, the question is whether the incident more probably resulted from defendant's negligence as opposed to another cause. A plaintiff may rely upon common sense and experience or expert testimony to prove that the incident more probably resulted from negligence. To invoke *res ipsa loquitur*, the plaintiff must demonstrate that the defendant had exclusive control of the injuring instrumentality at the time of injury. Exclusive control is an expansive concept which focuses upon who has the right or power of control and the opportunity to exercise it. The existence of multiple defendants or the possibility of multiple causes does not automatically defeat the application of *res ipsa loquitur*.

*Rector v. Oliver*, 809 N.E.2d 887, 889-90 (Ind. Ct. App. 2004) (internal citations omitted).

Because the Smiths did not prevail at trial, they appeal from a negative judgment. A judgment entered against a party who bore the burden of proof at trial is a negative judgment. *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002). On appeal, we will not reverse a negative judgment unless it is contrary to law. *Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994). To determine whether a judgment is contrary to law, we consider the evidence in the light most favorable to the appellee, together with all the reasonable inferences to be drawn therefrom. *J.W. v. Hendricks Cnty. Office of Family & Children*, 697 N.E.2d 480, 482 (Ind. Ct. App. 1998). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different than that reached by the trial court. *Mominee*, 629 N.E.2d at 1282.

We have stated the following about medical malpractice actions:

> To prevail in a medical malpractice action, the plaintiff must prove three elements: "(1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." The physician has a duty to conform to the standard of care of a reasonably prudent physician in providing care to a patient. More specifically, the physician is "required to possess and exercise that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful and prudent practitioner in the same class to which he belongs treating such maladies under the same or similar circumstances." Care that falls below the requisite standard establishes a breach of the physician's duty.

> When a medical review panel issues an opinion in favor of the physician, the plaintiff must present expert medical testimony to negate the panel's opinion. If the plaintiff fails to provide sufficient expert testimony, summary judgment should be granted in favor of the defendants. However, a medical malpractice case based upon negligence is rarely appropriate for disposal by summary judgment, particularly when the critical issue is whether the defendant exercised the appropriate standard of care under the circumstances. This issue is generally inappropriate for resolution as a matter of law and is a question that should be reserved for the trier of fact.

6

*Mills v. Berrios*, 851 N.E.2d 1066, 1070 (Ind. Ct. App. 2006) (internal citations omitted).

Furthermore,

[I]n order for the plaintiff to carry [his] burden of proof, [he] must present evidence of probative value based on facts, or inferences to be drawn from the facts, establishing both that the wrongful act was the cause in fact of the occurrence and that the occurrence was the cause in fact of [his] injury. The plaintiff's burden may not be carried with evidence based merely upon supposition or speculation. Standing alone, evidence establishing a mere possibility of cause or which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict. Civil liability may not be predicated purely upon speculation.

*Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994) (internal citations omitted).

In this case, the Smiths presented the expert testimony of Dr. Jeffery Sassmannshausen ("Dr. Sassmannshausen"), a board certified dermatologist, who agreed with the medical review panel that DLSA did not breach the standard of care owed to Smith and did not breach the standard of care in controlling the setting for the PUVA machine. Furthermore, while the Smiths did establish that Smith received serious burns to his body, at most, the trial court was left to speculate that the PUVA machine may have malfunctioned and that the malfunctioning may have caused his injuries.

The Smiths were not able to establish that Smith received both UVA and UVB treatment on December 8, 2004, which was their theory of how Smith's burns occurred. Smith testified that there was nothing different about his treatment on that day as compared to any of his prior treatments. He did not perceive that anything different happened during his treatment and could not state that both the UVA and UVB bulbs were on during that treatment.

Additionally, the evidence presented to the trial court showed that there were no maintenance issues which could have caused both the UVA and UVB bulbs to come on during Smith's treatment. The Smiths were not able to establish that a lack of maintenance or some other defect with the PUVA machine contributed to or caused Smith's burns. DLSA employees inspected the machine after learning of Smith's injuries and could not determine the cause of Smith's burns. They could not decide which of the possibilities had led to Smith's injuries. Those possibilities included, a machine malfunction, burns as a result of the treatment, or a problem with the doors of the machine increasing the time remaining for the pre-treatment warm-up of the machine.

The Smiths were also unable to establish that DLSA breached the standard of care by failing to evaluate Smith during his PUVA treatments. Dr. Gilbert routinely saw Smith following his treatments and would discuss them with him.

While the Smiths were able to point to a specific instrumentality, the PUVA machine, as the cause of Smith's burn injuries, they were unable to establish that DLSA had exclusive control of the PUVA machine. Smith was alone in the room with the PUVA machine during and after his treatment on December 8, 2004 with keys to both the UVA and UVB control panels. Smith had the opportunity and ability to turn on the UVB lights, but denied doing so. None of the other patients who used the PUVA machine at DLSA's Lake Avenue office on December 8, 2004 experienced a reaction such as Smith's to the treatment.

In sum, the Smiths were unable to establish the first element of the doctrine of *res ipsa loquitur*, that DLSA had exclusive control of the PUVA machine. The trial court in this bench trial, in its fact-finding role, was the sole judge of the credibility of the witnesses.

8

There was contrary evidence on this element, and the trial court was left to resolve those differences. We cannot say that the evidence leads unerringly to a conclusion that is different than that reached by the trial court.

Moreover, the Smiths were unable to establish the second element of the doctrine of *res ipsa loquitur*, that Smith's injuries would not have occurred without negligence. Dr. Sassmannshausen testified that a patient who experiences UV burns does not necessarily receive those burns as a result of malpractice. He testified that while a properly functioning machine should not cause a UV burn to a patient, a UV burn could be caused by a patient receiving too much of a dose, which is not necessarily evidence of malpractice. A UV burn is one of the risks of light treatment.

Dr. Jeffrey Moore ("Dr. Moore"), a dermatologist who served on the medical review panel in this matter, testified that a UV burn could have occurred without negligence. Dr. Moore testified that he has had patients of his own become phototoxic, or adversely reacting to treatment due to light sensitivity, after receiving a treatment in a PUVA machine that was properly functioning, properly maintained, and properly set. Further, he testified that patients with unstable psoriasis, as was Smith's condition, may have reactions to treatment that are described as idiosyncratic, or unexpected, and beyond explanation. In his opinion, phototoxicity is a known complication of PUVA treatment for psoriasis, and in his vernacular, a burn injury such as Smith's, was a phototoxic reaction.

The Smiths were unable to establish that Smith's injuries would not have occurred without negligence. The trial court in this bench trial, in its fact-finding role, was the sole judge of the credibility of the witnesses. "The trier of fact must resolve conflicts in the

9

evidence and determine which witness testimony to credit." *Bradley v. State*, 765 N.E.2d 204, 212 (Ind. Ct. App. 2002). There was contrary evidence on this element. and the trial court was left to resolve those differences. We cannot say that the evidence leads unerringly to a conclusion that is different than that reached by the trial court.

We further conclude that the Smiths' substantial rights were not adversely affected as a result of the trial court's refusal to apply the doctrine of *res ipsa loquitur*. The inference was not applied because there was contrary evidence on each of the elements of the doctrine. The trial court, as trier of fact, was left to resolve the conflicts in the evidence and to determine which testimony was more credible. Although the Smiths' sole theory of recovery was *res ipsa loquitur*, they did not meet their burden of persuasion, and have failed to establish on their appeal from a negative judgment that the evidence leads unerringly to a conclusion that is different from that reached by the trial court.

Affirmed.

NAJAM, J., and MAY, J., concur.