# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**PAUL J. CARROLL**
Mercer Belanger, P.C.
Indianapolis, Indiana



FILED

Apr 30 2014, 11:07 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

FIRST RESPONSE SERVICES, INC., )
)
    Appellant-Plaintiff, )
)
        vs. )    No.  41A01-1305-PL-224
)
VINCENT A. CULLERS, )
)
    Appellee-Defendant, )
)
_____)
VINCENT A. CULLERS, )
)
    Counterclaim Plaintiff, )
)
        vs. )
)
FIRST RESPONSE SERVICES, INC., )
)
    Counterclaim Defendant. )

APPEAL FROM THE JOHNSON SUPERIOR COURT
The Honorable Kevin M. Barton, Judge
Cause No. 41D01-1101-PL-79

**April 30, 2014**

**ROBB, Judge**

Case Summary and Issue

First Response Services, Inc. ("First Response") provided water remediation services for Vincent Cullers at his home and filed a complaint for breach of contract and unjust enrichment when Cullers did not pay its $7,722.43 invoice. The trial court found that First Response's contract with Cullers violated the provisions of the Indiana Home Improvement Contract Act ("HICA"), but First Response was entitled to payment for its services in the amount of $3,780.38. Because it found a violation of the statute, however, the trial court denied First Response's request for attorney fees pursuant to its contract. First Response appeals the trial court's judgment, raising two issues for our review that we consolidate and restate as one: whether the trial court erred in denying attorney fees based upon its determination that First Response had violated HICA. Concluding the trial court did not err, we affirm.

Facts and Procedural History

On July 4, 2010, Vincent Cullers and his wife returned home after several days away to find that their sump pump had malfunctioned and water had infiltrated their basement. The carpet was wet, wood flooring had buckled, the bottoms of doors had warped, the baseboards had water stains and spots of mildew, and the house smelled musty. Cullers and his family moved boxes and furniture out of the basement and began vacuuming water from the carpet. Cullers also contacted a carpet company he was familiar with, which referred him

to First Response.  Cullers called First Response on July 4 and left a message.  Mark Mauck, president of First Response, returned his phone call in the late afternoon of July 4 and said the company was closed July 4 and 5 for the Independence Day holiday, but he would have someone contact Cullers.  On the evening of July 5, Chris Wright representing First Response came to the residence to assess the situation.  Wright and the Cullerses discussed removing the carpet and pad and because no one knew how long the water had been in the basement, Wright recommended checking for moisture in the drywall and discarding anything that had been in the basement.  No contract or other document describing the work to be done was prepared, and no estimate for the cost of the work was given at that time.

On the morning of July 6, a dumpster was delivered to the residence which Cullers had not expected.  Thereafter, employees of First Response arrived and began removing the carpet.  Sometime after work began, one of the employees presented two documents for Cullers to sign:  a "Third Party Work Authorization" form and a "Customer Communication/Work Authorization" form listing "[i]nstructions and authorization for the restoration of your property."  Appendix of Appellant at 52, 53-55.  The Third Party Work Authorization form states, in pertinent part:

> This authorization is made this 6[1] day of June,[2] 2010 by and between First Response Services, Inc. hereinafter referred to as (First Response), and Vincent Cullers presently residing at [address] herein after [sic] referred to as Customer.

---

[1]  Underlining indicates those parts of the form that were originally blank and were completed when the document was presented to Cullers for his signature.

[2]  All parties agree this is a mistake; the document was prepared on July 6, 2010.

3

> The Customer authorizes First Response to proceed with its recommended procedures to preserve, protect and secure from further damage the property located at [address] and with the understanding that <u>Vincent Cullers</u> is hereby responsible for all services and charges to be performed by First Response, as authorized by <u>Vincent Cullers</u>, and the Customer further authorizes and directs <u>State Farm</u> to pay First Response direct.
> It is fully understood that the Customer is personally responsible for and [sic] charges, deductible, and depreciation not covered by <u>State Farm</u>.
> . . . In the event any legal proceedings must be instituted First Response shall be entitled to recover the cost of collection including reasonable attorney's fees. All charges and costs are due upon completion of work. Late charges of 1.5% per month (minimum of $1.00) will be charged on any unpaid balance after thirty (30) days.

<u>Id.</u> at 52. The document is signed by "Vincent Cullers" on both the line for "Authorized Signature" by "Property Owner/Claimant" and the line for "First Response Services, Inc."

<u>Id.</u> The Customer Communication/Work Authorization form consists of three pages with several paragraphs, each preceded by a box for the customer to initial indicating his agreement or understanding. This document includes paragraphs describing the effects of abnormal water and how to reduce mildew growth and damage, paragraphs describing the drying equipment to be used and safety measures to be observed during the remediation process, and the following paragraphs relevant to this dispute:

> **Authorization**: I the Owner/Agent for the job site listed below, authorize First Response Services to enter my property, furnish materials, supply all equipment and perform all labor necessary to preserve and protect my property from further damage, and to perform all restoration procedures necessary to repair and restore the carpet, furniture, structure and other furnishings.
> **Prices:** I understand that water damage is a progressive condition and that drying time varies depending on the types of materials, quantity of water, degree of saturation, airflow volume and velocity, temperature and the indoor and outdoor humidity. Therefore, I understand it is impractical to give an accurate quote for services before completion. I have been supplied with First Response Services' standard price list and agree to pay the prices listed. First

4

> Response Services agrees to keep accurate records and provide documentation
> if requested.

Id. at 54-55. Cullers initialed all the relevant boxes and signed the document.

Cullers left the residence while the work was being performed. When he returned, First Response employees were gone, the carpet and pad had been removed, and there were several pieces of drying equipment in the basement, "which [he] did not expect," transcript at 337, and which he "had not given any authorization to have," id. at 338. Cullers left a voice mail with First Response asking to have the equipment removed. Cullers spoke with two representatives of First Response on July 7 about having the equipment removed. On July 8, Mauck removed the drying equipment. At that time, Mauck requested that Cullers sign a statement that the equipment was being removed against First Response's advice; Cullers refused. Cullers offered Mauck a check for $1,200 as payment in full; Mauck declined. The dumpster was removed several days later. All parties agree no estimate was ever provided: Cullers insists he and his wife requested an estimate multiple times and expected to be given an estimate before work commenced; Mauck testified that First Response cannot tell just from a visual inspection the severity of the water intrusion and that it "never give[s] out any sort of numbers right off the bat until we can totally assess what's happening in there . . . until we know exactly what it's going to take to dry out." Id. at 32.

In August 2010, Cullers received an invoice from First Response for water mitigation services in the amount of $7,722.43. Cullers again offered the $1,200 check as payment in full; First Response again declined to accept it. On November 4, 2010, First Response filed a

5

complaint for damages against Cullers,[3] alleging breach of contract and unjust enrichment.

Cullers filed an answer, alleging as an affirmative defense that First Response failed to

comply with HICA, and a counterclaim, alleging First Response's delivery of the dumpster

had caused damage to his driveway.[4] Following a bench trial, the trial court issued findings

of fact and conclusions thereon at the request of First Response, which state, in pertinent

part:

CONCLUSIONS
* * *
20. The contract between the parties is subject to [HICA].
* * *
26. First Response violated Indiana Code 24-5-11-10(a) by failing to provide to Mr. Cullers a contract that included "(a) reasonably detailed description of the proposed home improvements", "the home improvement contract price" and "starting and completion dates."

27. Having determined that First Response did violate Indiana Code 24-5-11-10(a), the issue is then what consequences are provided.

28. Indiana Code 24-5-11-14 provides that "(a) home improvement supplier who violates this chapter commits a deceptive act that is actionable by the attorney general or by a consumer under IC 24-5-0.5-4 and is subject to the remedies and penalties under IC 24-5-0.5."
* * *
45. Mr[.] Cullers has not established an uncured deceptive act under the Deceptive Consumer Sales Act due to the lack of notice.

46. The Court is unable to find evidence of "a scheme, artifice, or device with intent to defraud or mislead" so as to constitute an incurable defective act.

47. Accordingly, Mr. Culler[s] has not satisfied the condition prerequisite to availing himself to the remedies available under the Deceptive Consumer Sales Act, including the remedy of declaring the contract void under Indiana Code 24-5-0.5-4(d).

---

[3] The complaint named Vincent Cullers alone as a defendant.

[4] We rely primarily upon the statements in the Brief of Appellant and somewhat on the trial court's findings regarding both the allegations of the complaint and counterclaim and the content of the answer, as no pleadings have been provided to us in the record.

48. Having determined that the remedies under the Deceptive Consumer Sales Act are not available to Mr. Cullers, the Court turns to the remedies under [HICA]. . . .

49. Here, Mr. Cullers contacted First Response and requested that First Response provide services. In response to Mr. Cuellers [sic] request, First Response did provide services to Mr. Cullers. Mr. Cullers now seeks to avoid payment for services received at his request based upon [HICA]. With the exception of the alleged damage to the concrete, Mr. Cullers does not assert that the services provided by First Response were defective. . . . The Court is unable to determine that it is the intent of [HICA] that a Home Improvement Supplier not receive reasonable compensation for proper services provided at the request of a homeowner consumer.

50. The Court concludes that there is a contractual obligation that Mr. Cullers had to pay First Response for it's [sic] services.
* * *

65. Based upon the foregoing considerations, the Court finds that the amount due First Response by Mr. Cullers is Three Thousand Seven Hundred Eighty Dollars and Thirty-Eight Cents ($3,780.38).
* * *

68. First Response seeks an award of attorney fees under the Third Party Work Authorization. While the Court does recognize that the Third Party Work Authorization does provide for attorney fees, the Court also must take into account that this litigation has resulted due to the failure of First Response to comply with [HICA]. Had First Response identified the work to be performed and the price for the work to be performed as required by [HICA], it is unlikely that the pending litigation would have resulted.
* * *

70. The Court must conclude that the violation of [HICA] should not be rewarded by permitting the home improvement supplier to recover attorney fees. The request for attorney fees by First Response is denied.
* * *

IT IS THEREFORE ORDERED BY THE COURT, That Judgment is entered in favor of FIRST RESPONSE and against VINCENT CULLERS in the amount of Three Thousand Seven Hundred Eighty Dollars and Thirty-Eight Cents ($3,780.38) together with interest on the judgment as provided by law and the costs of the action.

App. of Appellant at 35-51. First Response now appeals, specifically challenging the trial court's finding that its contract did not comply with HICA and it is therefore not entitled to attorney fees pursuant to the contract.

7

## Discussion and Decision

### I. Standard of Review

We note first that Cullers has not filed a brief. When an appellee fails to submit a brief, we do not develop arguments for him and we apply a less stringent standard of review. Laflamme v. Goodwin, 911 N.E.2d 660, 664 (Ind. Ct. App. 2009). "[W]e may reverse if the appellant establishes prima facie error, which is an error at first sight, on first appearance, or on the face of it." Id.

"On appeal of claims tried by the court without a jury . . ., the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). Where, as here, the trial court issues findings of fact and conclusions of law pursuant to a party's request, we apply a two-tiered standard of review. Baird v. ASA Collections, 910 N.E.2d 780, 785 (Ind. Ct. App. 2009), trans. denied. We first determine whether the evidence supports the findings and then determine whether the findings support the judgment. Id. We review for clear error and will reverse only if the trial court's findings are unsupported by any evidence or reasonable inferences drawn from the evidence or if the judgment is unsupported by the findings and conclusions. Id. With respect to the trial court's findings of fact, we defer substantially; with respect to its conclusions of law, we apply a de novo standard. Id.

Additionally, First Response had the burden of proof at trial and therefore appeals from a negative judgment. Smith v. Dermatology Assocs. of Ft. Wayne, P.C., 977 N.E.2d 1,

8

4 (Ind. Ct. App. 2012).  On appeal, we will not reverse a negative judgment unless it is contrary to law—that is, unless considering the evidence in the light most favorable to the appellee together with all reasonable inferences to be drawn therefrom, we find the evidence points unerringly to a conclusion different than that reached by the trial court.  Id.

## II.  Home Improvement Contract Act

The trial court determined the contract between First Response and Cullers was governed by HICA, Indiana Code chapter 24-5-11.  HICA is applicable to an oral or written agreement between a home improvement supplier and a consumer to make any alteration, repair, replacement, reconstruction, or other modification costing over $150 to the consumer's residential property.  Ind. Code §§ 24-5-10-1, -3, -4.  It requires that the home improvement supplier provide a completed home improvement contract to the consumer that contains certain information, including a "reasonably detailed description of the proposed home improvements," the "approximate starting and completion dates of the home improvements," and the "home improvement contract price."  Ind. Code § 24-5-11-10(a)(4), (6), (8).  The trial court found the contract between First Response and Cullers—as detailed in the Third Party Work Authorization and Customer Communication/Work Authorization— was deficient for failing to include those specifics.

First Response does not dispute that HICA applies, but it does contend that the trial court erred in concluding the contract was governed by the provisions of Indiana Code section 24-5-11-10(a).  The Third Party Work Authorization Form includes information regarding Cullers's insurance carrier, and by signing it, Cullers authorized said carrier to pay

9

First Response directly and acknowledged he is liable for charges not covered by insurance. Because Cullers identified his insurance carrier, First Response argues the contract requirements are modified by Indiana Code section 24-5-11-10(c):

> (c) If a home improvement contract is entered into as a result of damage, loss, or expense that is covered, in whole or in part, by the proceeds of an insurance policy . . . the following conditions and requirements apply to the contract:
>
> (1) . . . the description [and] completion dates . . . must be prepared for the proposed home improvements to the extent that the damage, loss, or expense is reasonably known by the home improvement supplier.
>
> (2) . . . the requirement that a reasonably detailed description be included in the contract may be satisfied with a statement that the subject real estate will be repaired or restored to the same condition in which the real estate existed before the damage, loss, or expense occurred, or to a comparable condition.
>
> (3) . . . the starting and completion dates may be expressed in terms of the number of days elapsed from the date when sufficient approval of the insurance carrier terms allowing for adequate repair or restoration is obtained.
>
> (4) . . . the consumer may agree to a contract price expressed in terms of the consumer's liability for payment after the application of insurance proceeds . . . .

Ind. Code § 24-5-11-10(c) (2001).

We first note that the record does not include any of the pleadings in this case. The parties did not offer opening statements or closing arguments to the trial court and no mention was made of subsection (c) during testimony at the trial. The trial court's sole mention of this subsection is to note in its findings that "[t]here is no issue that the damage would be covered by insurance." App. of Appellant at 34-35. We cannot say the trial court committed clear error in not applying this subsection. Subsection (c) provides alternate requirements for a home improvement contract that "is entered into as a result of damage, loss, or expense that is covered, in whole or in part, by the proceeds of an insurance policy . .

10

. .” Specifically, the description of the work can be stated in terms of restoration to the same or comparable condition as before the damage, and the start/completion dates and price can be stated in terms relative to insurance approval and payment. The trial court found that after First Response had already started removing carpet from the basement, a First Response employee presented a form for Cullers to sign that included a space for the name of his insurance company and Cullers provided that information. The employee simply told Cullers that he needed a signature to authorize the work. There is no evidence that Cullers was advised that there were statutory requirements for a home improvement contract or that the requirements of the contract were different depending on whether insurance would cover part of the cost, that he was asked if he had contacted his insurance company, or that any inquiry was made into his insurance coverage. The mere fact that a consumer <u>has</u> insurance does not mean that the work will be <u>covered</u> by that insurance. In fact, Cullers testified that "at some point in time" he spoke with his insurance agent and learned that although items of personal property lost or damaged because of water would be covered, water remediation of the structure itself was not a covered loss under his policy. Tr. at 361-62.

The purpose of HICA "is to protect consumers by placing specific minimum requirements on the contents of home improvement contracts [because] few consumers are knowledgeable about the home improvement industry . . . ." <u>Benge v. Miller</u>, 855 N.E.2d 716, 720 (Ind. Ct. App. 2006). The home improvement supplier is therefore held to a strict standard. <u>Homer v. Burman</u>, 743 N.E.2d 1144, 1148 (Ind. Ct. App. 2001). It cannot have been the intent of the legislature to allow a company to routinely circumvent the strict

11

requirements of the statute by simply obtaining information about the fact of insurance without also inquiring into whether the insurance would actually cover the work. This is especially true given that a contract with the modified requirements is allowed by the terms of the statute if the work "is covered" by insurance, not "if the consumer has insurance" or if the work "might be covered." This does not, as First Response asserts in its brief, put the onus on the home improvement supplier to "know better than insured customers what insurance the consumer carried and whether or not certain labor would be covered." Brief of Appellant at 8. At most, this puts a burden on the supplier—who presumably knows the requirements of HICA—to inform the consumer that he should check with his insurer before proceeding rather than simply asking for the identity of his insurance carrier. Moreover, this keeps the home improvement supplier from using the fact of a consumer's insurance coverage as a trap for the unwary. Several cases dealing with HICA have noted the statute arose in part out of concern for "[t]he consumer's reliance on the contractor coupled with the well-known abuses found in the home improvement industry . . . ." Benge, 855 N.E.2d at 720. Under these circumstances, we cannot say First Response was entitled to offer to Cullers a contract modified by the terms of subsection (c).

Accordingly, as the trial court found, the two documents that comprise the contract in this case needed to comply with the requirements of subsection (a), and there is no question that it failed in several respects, most specifically with respect to a reasonably detailed description of the proposed home improvements and a price. Not coincidentally, these are the two items over which the dispute arose, as there was a fundamental miscommunication

between the parties as to the nature of the work Cullers wanted and the nature of the work First Response thought he was requesting and no communication whatsoever between the parties about the expected cost. Because the contract failed to comply with the requirements of HICA, First Response is not entitled to recover attorney fees pursuant to the terms of that contract.[5]

## Conclusion

The trial court's findings and judgment against First Response denying its request for attorney fees are not clearly erroneous and the judgment is, therefore, affirmed.

Affirmed.

BARNES, J., and BROWN, J., concur.

---

[5] The only relief First Response seeks is a determination that the contract met the requirements of subsection (c) and it is therefore entitled to attorney fees. It does not dispute that the trial court's reduction of its invoice price was appropriate.