## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 24 2018, 6:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey K. Eicher
Greenfield, Indiana

ATTORNEY FOR APPELLEES

Martin R. Shields
New Castle, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Reno,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Dennis O. Hamilton, Cathy A. Hamilton, Stephen Wayne Bell II, Stephanie L. Bell, Stacie L. Bell, Sonia K. Bell-Brenizer,[1]<br><br>*Appellees-Defendants.* | May 24, 2018<br><br>Court of Appeals Case No.<br>33A01-1711-PL-2669<br><br>Appeal from the<br>Henry Circuit Court<br><br>The Honorable<br>David L. McCord, Judge<br><br>Trial Court Cause No.<br>33C03-1301-PL-2 |

---

[1] The CCS reflects that on August 8, 2016, plaintiff John Reno voluntarily dismissed the following defendants from the lawsuit: Stephen Wayne Bell II; Stacie L. Bell; Stephanie L. Bell; and Sonia K. Bell-Brenizer. *Appellant's App. Vol. 2* at 8. However, for reasons not entirely clear, the trial court and the parties continued to include those individuals as defendants in notices, pleadings, and orders; thus, we include them here pursuant to Appellate Rule 17(A), which provides that a party of record in the trial court shall be a party on appeal.

**Kirsch, Judge.**

[1] This case involves different parties purchasing the same parcel of real estate. John Reno ("Reno") filed a complaint to quiet title in the subject real property. Following a bench trial, the trial court determined that Reno was not entitled to the requested relief. Reno now appeals, raising two issues that we consolidate and restate as: Whether the trial court erred when it determined that Reno, who possessed a 2006 unrecorded deed, was not entitled to quiet title in the subject real property, which Dennis O. Hamilton and Cathy A. Hamilton ("the Hamiltons") purchased from third parties in 2012 for valuable consideration following at least two title searches that did not reflect Reno as being the owner of the property.

[2] We affirm.

## Facts and Procedural History

[3] The property at issue consists of approximately 3.06 acres, described in three legal tracts, located on Trainor Street in New Castle, Indiana ("the Property").[2] One tract lies adjacent to land owned and occupied by Reno's business, Reno's Auto Salvage, and contains the driveway used to access Reno's Auto Salvage; the other two tracts are across a street. The Hamiltons, along with Cathy

---

[2] We note that Reno cites to various exhibits in his Appellant's Brief. *See Appellant's Br.* at 7-12 (citing to various of Plaintiff's and Defendant's exhibits from trial). Although a table of contents of exhibits was filed with this Court, the exhibits themselves were not. However, because we find that copies of the pertinent documents are included in the parties' appendices, we are able to review the case.

Hamilton's mother, own real estate either adjacent to or in the immediate vicinity of the Property. *Tr. Vol. II* at 117, 129. As is relevant here, the Property was transferred several times, and in his complaint, Reno claimed to have a superior interest. The relevant history of the Property is as follows.

In 2000, the Property was owned by Reno. On October 17, 2000, Reno conveyed it to his friend, Stephen W. Bell ("Bell"). Reno conveyed the Property to Bell as a favor, in order that Bell would have collateral necessary to obtain a loan from the bank. On September 21, 2005, Bell died without a will. He was survived by four children: Stephen Wayne Bell II, Stephanie L. Bell, Stacie L. Bell, and Sonia K. Bell-Brenizer (together, "the Bell Heirs"). The Bell Heirs did not open or administer an estate for their father.

Eventually, Bell's loan fell into default and the lender, MainSource Bank ("MainSource"), initiated a foreclosure action on a mortgage that was secured by the Property. MainSource named the Bell Heirs as defendants in the foreclosure action, and on May 5, 2006, MainSource obtained an *in rem* default judgment in the amount of $29,753.28.[3] Thereafter, the Property was noticed for sale at a July 25, 2006 sheriff's sale. Michael McKown ("McKown"), a local real estate broker and long-time friend of Reno's, noticed that the Property was going to be sold at the upcoming sheriff's sale, and knowing that the Property adjoined Reno's salvage yard and that Reno previously had owned it,

---

[3] The judgment was *in rem* only and thus was not a judgment against the Bell Heirs personally.

McKown contacted Reno to advise him that the Property was going up for auction. Reno advised McKown that he wanted to purchase it, so Reno attended the sheriff's sale with McKown on July 25, 2006, and with McKown's assistance with the bidding, Reno purchased the Property for $500. A Sheriff's Deed for the three tracts comprising the Property, dated July 25, 2006, was mailed to Reno. He received the Sheriff's Deed, but never recorded it.

[6] After he purchased the Property at the sheriff's sale, Reno began receiving the associated tax bills for the Property, addressed to "Stephen Bell in care of John Reno." *Tr. Vol. II* at 176. Reno did not timely pay the real estate taxes on the Property for the period of the sheriff's sale through and including October 2009.

[7] Cathy Hamilton ("Cathy"), a subsequent purchaser of the Property and a named defendant in Reno's complaint, was raised in the Trainor Street area, which was referred to by locals as the "Hollow" or "Blue River Valley," an area comprised of "small, humble homes." *Id.* at 123-25. After graduating from high school, Cathy moved away from the Hollow for several decades to attend college and work. In 2007, she moved back to the area with her husband, Dennis Hamilton ("Dennis"), and their adult daughter. Cathy's mother still lived in the Hollow. The Hamiltons bought a number of properties in the Hollow, tore down the dilapidated homes, cleaned up the area, and built two separate homes connected by a breezeway; this arrangement met the needs of their adult daughter, who Cathy testified had multiple disabilities and would never be able to live entirely on her own. *Id.* at 127-28. Cathy's mother's home was next to the Property.

In October 2009, the Property was listed in a legal notice in the local newspaper, stating that the Property was going to be sold at an upcoming tax sale ("2009 Tax Sale"). Bell was listed in the legal notice as the owner of the Property. *Appellees' App. Vol. 2* at 2. Dennis saw the publication for the 2009 Tax Sale, and because the Property was in the vicinity of the Hamiltons' home and next to Cathy's mother's residence, Dennis attended the 2009 Tax Sale and purchased the Property, receiving a tax sale certificate for his purchase.

Prior to the date of the 2009 Tax Sale, McKown had seen the published legal notice stating that the Property was going to be up for sale, so he contacted Reno to let him know. Reno did not attend the 2009 Tax Sale, but McKown did, and he saw Dennis purchase the tax certificate for the Property. Evidence was presented that McKown approached Dennis at the sale and told him that someone else owned or had an interest in the Property. Following the 2009 Tax Sale, and because of McKown's comments, the Hamiltons retained an attorney, and the attorney obtained a title search for the Property. *Tr. Vol. II* at 158. The search revealed that Bell owned the Property and no one else had a legal interest in it.

Under Indiana law, there is a one-year redemption period within which a property's delinquent taxes may be paid,[4] and, if this occurs, then title does not

---

[4] "[A] purchaser of Indiana real property that is sold for delinquent taxes initially receives a certificate of sale. . . . Thereafter, a one-year redemption period ensues." *In re 2002 Lake Cty. Tax Sale of Real Prop. With Delinquent Taxes or Special Assessments Tax I.D. No. 16-27-0122-0026.,* 818 N.E.2d 505, 508 (Ind. Ct. App. 2004) (citing to Indiana Code sections 6-1.1-25-1 and 6-1.1-25-4).

pass to the purchaser of the tax sale certificate and, instead, the real estate remains titled as it was at the time of the tax sale. In this case, a few days before the expiration of the one-year redemption period for the Property, Reno paid the amount necessary to redeem the Property from the 2009 Tax Sale, such that Dennis's earlier purchase and receipt of the tax certificate had no legal effect.

[11] In early 2012, the Hamiltons received a telephone call from one of the Bell Heirs, Stephanie, who conveyed that the Bell Heirs had heard that the Hamiltons wanted to purchase the Property. Dennis informed Stephanie that the Hamiltons were, in fact, interested in purchasing it as long as the Bell Heirs had interest to sell. For that purpose, the Hamiltons obtained a second property records search on the Property, which covered the period of time from October 17, 2000 to January 20, 2012. It indicated that the title to the Property was listed in the name of the "Heirs at Law of Stephen Wayne Bell, deceased." *Appellees' App. Vol. 2* at 4-5.

[12] On February 3, 2012, the Hamiltons met the Bell Heirs at the Hamiltons' attorney's office to close on the Hamiltons' purchase of the Property. The Hamiltons paid $4,000, or $1,000 to each of the four Bell Heirs. At that time, the real estate taxes were delinquent, and the Hamiltons also paid the taxes. In return, the Bell Heirs executed and gave to the Hamiltons an Affidavit of

Transfer of Real Estate and a Warranty Deed to the Property. *Appellees' App. Vol. 2* at 6-12. The Affidavit of Transfer stated, in part, that the Property was the only probate asset of their deceased father, the four Bell Heirs were the only legal heirs, and they were entitled to the Property as a result of their father's death. *Id.* at 9-10. The Hamiltons recorded the warranty deed on February 8, 2012.

[13] Approximately two months later, in April 2012, Cathy saw Reno and told him that the Hamiltons owned the Property, and Reno informed her about his possession of a 2006 Sheriff's Deed to the same property. Thereafter, the Hamiltons consulted their attorney, and a third property search was conducted. This time a copy of the unrecorded sheriff's deed was found in a file in the Henry County Clerk's Office. Reno attempted to record his Sheriff's Deed in the Henry County Recorder's Office, but the Recorder's Office did not allow him to do so because of the existing warranty deed that the Hamiltons had recorded in February 2012.

[14] On January 7, 2013, Reno filed a two-count complaint against the Hamiltons and the Bell Heirs. *Appellant's App. Vol. 2* at 13-16. Count 1 of Reno's complaint was a quiet title claim and an adverse possession claim, claiming that Reno owned the Property based on his 2006 purchase of it at the sheriff's sale. *Id.* at 13-15. Count 2 of Reno's complaint was a claim for conversion, claiming that the Bell Heirs' warranty deed was fraudulent and represented conversion as to Reno's ownership rights to the Property. *Id.* at 15-16.

[15] The Hamiltons timely answered the complaint, and in addition to their general admissions and denials, the Hamiltons counterclaimed to quiet title in their favor.[5] They alleged that they were bona fide purchasers of the Property, having purchased it from the Bell Heirs, in good faith, for a valuable consideration and without notice, after first obtaining two property record searches. Reno thereafter filed a motion for summary judgment, asserting that his Sheriff's Deed was first in time and that the Hamiltons were not bona fide purchasers for value. His motion acknowledged that the unrecorded Sheriff's Deed "may on the surface create a gap in the chain of title," but that the Hamiltons had "actual notice of [] Reno's interest in the subject real estate due to [his] continuous possession of said real estate." *Id.* at 69. The trial court denied Reno's motion by summary order, finding that genuine issues of material fact existed. The matter proceeded to bench trial on July 27, 2017.[6]

[16] Sonia K. Bell-Brenizer ("Sonia"), one of Stephen W. Bell's children, testified telephonically at the bench trial. She was aware that her deceased father had a home on the Property, but she had never been to it or seen it; she moved to Indiana in 2006, after his death. She stated that he did not have a will when he died. She was not aware of the previous mortgage foreclosure action, in which

---

[5] The Bell Heirs did not file any responsive pleading to Reno's complaint.

[6] The record before us indicates that a prior bench trial was held on June 30, 2016, Reno thereafter filed a motion for new trial, and, according to the CCS, the request was granted in December 2016, with the second trial occurring on July 27, 2017. *Appellant's App. Vol. 2* at 7, 8, 90, 174; *see also Tr. Vol. II* at 10 (recognizing at July 2017 trial that "we're trying this for a second time").

she and her siblings were named as defendants. *Tr. Vol. II* at 56. Sonia stated that in 2012 or after, she was contacted by someone by phone who left a message on her answering machine, which message led to Sonia's sister, Stephanie, calling the Hamiltons to discuss with them whether they had an interest in buying her deceased father's property. Thereafter, the Bell Heirs met the Hamiltons at the Hamiltons' attorney's office in February 2012, and, Sonia explained, the Bell Heirs were shown a proposed deed transferring title from them, as surviving heirs, to the Hamiltons, and the Hamiltons offered to pay them $4,000 for the Property. Sonia testified that owning the Property was "a surprise to us" and "at first, we told them, well, . . . we don't know anything about this land[,]" but that "[t]hey said they did several title searches and it fell back on my father's name" and therefore, after he died, to the four children. *Id.* at 59, 66, 68; *see also id.* at 68 ("They said that they had ran those titles back several times and it kept coming back in our father's name.").

[17] Reno testified that, with McKown's assistance, he bid on and purchased the Property at a sheriff's sale in 2006, that the Sheriff's Deed thereafter was mailed to him, but, at that time, he was recovering from surgery and an employee got his mail and put it in a lock box. *Id.* at 80. Reno testified that he assumed the deed had been recorded, noting that this was the first sheriff's sale that he ever attended and that when it arrived, it came in an official envelope that he believed was from the courthouse. *Id.* at 80-81, 85, 103. Reno explained that it was not until April 2012, when Cathy approached him and told him that the

Hamiltons bought the Property, that he looked for and found the Sheriff's Deed. *Id.* at 81.

[18] On cross-examination, Reno acknowledged that he knew at the time of the 2006 sheriff's sale that it was his responsibility to record the Sheriff's Deed. *Id.* at 102. When he was questioned about the fact that, in 2010 when he redeemed the Property, it was still in Bell's name but he did not do anything about it, Reno asserted, "I hadn't had my deed yet" because it was still "locked up" in another location, where his employee had placed it when it came in the mail. *Id.* at 182. Counsel asked, "But that is no fault of the Hamilton[]s, is it?" and he replied, "That's no fault of mine either." *Id.* Reno also confirmed that he did not pay timely the property taxes on the Property after purchasing it at the sheriff's sale, until he paid in 2010, within the one-year redemption period. *Id* at 106. He also did not timely pay them after that, resulting in delinquent taxes being owed when the Hamiltons purchased the Property in February 2012. With regard to taxes, Reno stated that he knew "how [the redemption period] works. I know I got a year and I don't worry about it." *Id.* at 117. With regard to the Hamiltons' 2012 purchase of the Property, Reno acknowledged that his Sheriff's Deed was not "ever put in the chain of title," but maintained, "[The Hamiltons] didn't have no knowledge of my deed, but they had knowledge that I owned it," which knowledge was based on his use of it and what Reno believed other people, including McKown, had told the Hamiltons. *Id.* at 105.

[19] Cathy testified that before purchasing the Property, the Hamiltons had two title searches conducted, and there was no record of Reno owning the Property. She

acknowledged having heard "rumors" that Reno had an ownership interest in the Property, but that was not reflected in their title searches. *Id*. at 133. She also testified that the advertisement for the 2009 Tax Sale indicated that Bell, not Reno, owned it. She stated that, after they had purchased the Property, and after Reno had told her that he owned the Property, the Hamiltons had a third title search done, and a copy of the unrecorded Sheriff's Deed was found in the Clerk's office in a file, "not in a judgment index or anything." *Id.* at 144. Cathy testified that she and her husband were "absolutely" dealing with Bell Heirs in good faith when the Hamiltons met and purchased the Property. *Id*. at 134. When asked whether she or her husband had hired a private detective to locate and contact the Bell Heirs, Cathy said, "Not for this or anything else in our entire life." *Id*. at 135. She testified that she, her husband, and to her knowledge, her attorney had "absolutely nothing" to do with finding the Bell Heirs. *Id*. at 150. With regard to whether the Hamiltons would be willing to convey a strip of land in fee simple to Reno for purposes of ingress and egress, she replied, "[O]f course, we would do that. We'd convey that to him[,]" and they would pay to have it surveyed and the deed prepared. *Id*.

[20] Dennis testified about the legal notice for the 2009 Tax Sale, which identified Bell as the owner, and about his attendance at the 2009 Tax Sale and purchase of the Property. With regard to whether McKown had approached Dennis at the 2009 Tax Sale and told him that Reno owned it, Dennis stated that he remembered that "a gentleman came up to me and said someone else is interested in this property," but did not identify by name the someone else. *Id*.

at 158. Dennis said that he understood McKown's statements to mean that someone else thought that they owned it. Based on those comments, Dennis stated that he and Cathy hired a lawyer and had a title search conducted, which did not reflect any owner besides Bell. Dennis stated that sometime after the Property was redeemed, one of the Bell Heirs telephoned the Hamiltons, stating that they had heard that the Hamiltons "were possibly interested in that land" and asked if the Hamiltons would be interested in purchasing it from them. *Id.* at 160. In preparation for meeting with the Bell Heirs on February 3, 2012, the Hamiltons had the second title search completed and had their attorney prepare an Affidavit of Transfer of Real Estate for the Bell Heirs' signatures as well as a Warranty Deed. Dennis said that they paid $1,000 to each of the four Bell Heirs and also paid delinquent property taxes.

[21] On cross examination, Dennis acknowledged that, before buying the Property from the Bell Heirs, he knew that Reno owned the salvage yard near the Property and knew that Reno's driveway to the salvage yard was on the Property. *Id.* at 169. Dennis stated when the Property was redeemed in October 2010, following his purchase of it at the 2009 Tax Sale, he went to the county courthouse and asked who had redeemed the tax certificate and was told that Reno had redeemed it. *Id.* at 170.

[22] The trial court took the matter under advisement, and both parties submitted their respective proposed findings, orders, and judgments. *Appellant's App. Vol. 2* at 147-66. The trial court, on September 1, 2017, entered its findings of fact, conclusions of law, and judgment. *Id.* at 121-40. It denied relief to Reno and

awarded fee simple ownership and possession of the Property to the Hamiltons, determining that the Hamiltons were bona fide purchasers who purchased the real estate in good faith, for valuable consideration, and without notice of any outstanding legal right of Reno. *Id*. at 137. The Order reflected that the Hamiltons agreed to execute a warranty deed to Reno, conveying in fee simple a strip of land sixteen feet wide across one parcel of land, in order to allow Reno to have full access to his property, and the Hamiltons agreed to have the necessary survey prepared at the Hamiltons' expense. Reno filed a motion to correct error, alleging newly discovered evidence, and the trial court denied the motion. Reno now appeals.

## Discussion and Decision

[23] Reno filed a complaint to, as is relevant here, quiet title in his favor as to the Property. Because Reno did not prevail at trial, he appeals from a negative judgment. *Smith v. Dermatology Assocs. of Fort Wayne, P.C.*, 977 N.E.2d 1, 4 (Ind. Ct. App. 2012) (judgment entered against a party who bore the burden of proof at trial is a negative judgment). On appeal, we will not reverse a negative judgment unless it is contrary to law. *Id*. "A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion." *Clark v. Crowe*, 778 N.E.2d 835, 839 (Ind. Ct. App. 2002).

[24] When the trial court has entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52 we apply the following two-tier standard of

review: whether the evidence supports the findings and whether the findings support the judgment. *Id*. The court's findings and conclusions will be set aside only if they are clearly erroneous, that is, that the record contains no facts or inferences supporting them. *Id.* at 839-40. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* at 840. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id*.

[25] Reno asserts that he had valid title to the Property by virtue of the Sheriff's Deed and that the trial court erred when it did not quiet title in his favor. He argues that "[t]he law in Indiana is that 'recording does not establish ownership, and whether or not a deed is recorded has no effect on its validity.'" *Appellant's Br.* at 14 (citing to *Patterson v. Seavoy*, 822 N.E.2d 206, 211 (Ind. Ct. App. 2005)). There is nothing in the record before us to indicate that the Sheriff's Deed did not give Reno valid title to the Property. However, because Reno never recorded it, we find no error with the trial court's refusal to quiet title in his favor.

[26] Indiana Code section 32-21-4-1 provides, in part:

> (a) The following must be recorded in the recorder's office of the county where the land is situated:
>
> > (1) A conveyance or mortgage of land or of any interest in land.

(2) A lease for more than three (3) years.

(b) A conveyance, mortgage, or lease takes priority according to the time of its filing. The conveyance, mortgage, or lease is fraudulent and void as against any subsequent purchaser, lessee, or mortgagee in good faith and for a valuable consideration if the purchaser's, lessee's, or mortgagee's deed, mortgage, or lease is first recorded.

"'The purpose of the recording statute is to provide protection to subsequent purchasers, lessees, and mortgagees.'" *Kumar v. Bay Bridge, LLC*, 903 N.E.2d 114, 116 (Ind. Ct. App. 2009) (quoting *Meyer v. Marine Builders, Inc.,* 797 N.E.2d 760, 774 (Ind. Ct. App. 2003)). Indiana is a race-notice state, and instruments will have priority according to the time of the filing thereof. *Meyer*, 797 N.E.2d at 774.

[27] Consistent with the recording statute, Indiana recognizes the bona fide purchaser doctrine. *Kumar*, 903 N.E.2d at 116. "'[T]o qualify as a bona fide purchaser, one has to purchase in good faith, for a valuable consideration, and without notice of the outstanding rights of others.'" *Id.* (quoting *Keybank Nat'l Ass'n v. NBD Bank,* 699 N.E.2d 322, 327 (Ind. Ct. App. 1998)). A record outside the chain of title does not provide notice to bona fide purchasers for value. *Meyer*, 797 N.E.2d at 774.

[28] Here, Reno conveyed the Property to his friend, Bell, in October 2000. Bell recorded the deed, and Bell used his ownership of the Property as collateral to secure a loan or mortgage from the bank. Bell died in 2005, his loan fell into

default, and the Property was auctioned at a sheriff's sale in July 2006. Reno, with McKown's assistance, purchased it at the July 2006 sheriff's sale for $500. A Sheriff's Deed for the Property was mailed to Reno, and, while his testimony is somewhat conflicting as what exactly happened to the Sheriff's Deed,[7] it is undisputed that Reno never recorded it, despite the fact that for several years, he received tax notices that arrived addressed to Bell "in care of" Reno, which arguably should have alerted Reno to the fact that Bell's name was still associated with the Property as an owner. *Tr. Vol. II* at 176. Yet, Reno did nothing to inquire about or rectify that.

[29]    In October 2009, a legal notice appeared in the local newspaper indicating that the Property was going to be sold at an upcoming tax sale due to unpaid taxes, and the published legal notice listed Bell, not Reno, as the owner. *Appellees' App. Vol. 2* at 2. Because the Property was adjacent to Cathy's mother's home, and in proximity to the Hamiltons' home, Dennis attended the 2009 Tax Sale and purchased a tax certificate for the Property. In December 2010, just a few days before the expiration of the one-year redemption period, Reno redeemed the Property by paying the taxes owed. Because Reno had never recorded his Sheriff's Deed, it is undisputed that the effect of his redemption returned title and ownership to then-deceased Bell. Once the Property was redeemed, the

---

[7] Reno generally stated that his employee retrieved the Sheriff's Deed when it came in the mail and that employee put it in a lock box, and Reno did not look for it, or even see it, until April 2012 when he searched for the deed because Cathy told him that the Hamiltons purchased the Property. *Tr. Vol. II* at 79-81, 103, 182. However, Reno also stated, "I just got the deed, opened it, seen it, put it in the safe[,]" and it is not clear whether Reno was referring to when it came in the mail in 2006 or, later, in April 2012. *Id*. at 95.

Hamiltons did nothing more to obtain the Property until receiving a phone call in January 2012 from one of the Bell Heirs, inquiring about the Hamiltons' interest in purchasing the Property. The Hamiltons obtained another title search that reflected record title of the Property being "Heirs at Law of Stephen Wayne Bell, deceased." *Appellees' App. Vol. 2* at 4. On February 3, 2012, the Hamiltons paid $4,000 to the Bell Heirs for the Property, and the Hamiltons also paid delinquent taxes.

[30] Reno maintains the Hamiltons did not qualify as bona fide purchasers without notice because, at a minimum, they should have known that he already owned the Property. Reno argues that there were "numerous 'clues'" that would have "put the Hamiltons on inquiry notice that [] Reno actually owned the subject [P]roperty[,]" including that (1) he conspicuously kept personal property on it, and (2) other people, including McKown, had told the Hamiltons about Reno's ownership interest. *Appellant's Br.* at 17. Reno suggests that the Hamiltons "could have simply asked" him if he owned it, could have called MainSource "to find out what happened to [Bell]'s mortgage"; or "entered the names of the Bell [H]eirs into Doxpop or Odyssey." *Id.* at 18; *Reply Br.* at 5-6. However, we are unwilling to place those requirements on a potential purchaser. Rather, we have previously held, "A "purchaser of real estate 'is presumed to have examined the records of such deeds as constitute the chain of title thereto under which he claims, and is charged with notice, actual or constructive, of all facts recited in such records showing encumbrances, or the non-payment of purchase-money.'" *Kumar*, 903 N.E.2d at 116-17 (quoting *Bank of New York v.*

*Nally,* 820 N.E.2d 644, 648 (Ind. 2005)). Here, the Hamiltons acknowledged that they had heard rumors or had been told by McKown that Reno may have an interest, and precisely because of that, they paid for two title searches, both of which indicated that Bell or his heirs were the title owners of the Property and reflected nothing about the sheriff's sale or Reno's Sheriff's Deed.[8] Given the record before us, we, like the trial court, find that the Hamiltons were bona find purchasers for value who purchased without notice of Reno's interest.

[31] To the extent that Bell asserts that the Hamiltons' warranty deed is "a worthless piece of paper" because the Bell Heirs lost any interest they had in the July 2006 sheriff's sale, *Appellant's Br.* at 22, there is no indication that the Hamiltons were aware of the sale, which we observe occurred before they moved back to the area in 2007, and no evidence that the Bell Heirs knew about the foreclosure or the sheriff's sale. Indeed, the evidence presented was that the Bell Heirs knew very little about the Property and were somewhat "surprise[d]" to learn about their ownership, but it was confirmed in the Hamiltons' title search. *Tr. Vol. II* at 59.

[32] Simply put, Reno was responsible for recording the 2006 Sheriff's deed, and he did not do so, despite knowing that recording deeds is necessary and despite

---

[8] Reno suggests that MainSource Bank's mortgage foreclosure action and the *in rem* judgment should have been "a red flag" to a reasonable person, indicating that "there may be a problem with title." *Reply Br* at 6; *id.* at 7 (stating that the Hamiltons or their advisors had a duty to investigate how the MainSource mortgage was satisfied, whether paid off or foreclosed upon). To the extent that this is a claim that the Hamiltons' title searches were not done correctly or completely, we find that any challenge to the propriety of those searches is outside the scope of this appeal.

continuing to receive tax bills in Bell's name. As a result of Reno's failure to record it, there was never any change in ownership reflected in the legal chain of title. Thus, pursuant to Indiana Code section 32-21-4-1(b), the Hamiltons' 2012 deed took priority over Reno's unrecorded 2006 Sheriff's Deed. Accordingly, the trial court's judgment, in favor of the Hamiltons and against Reno, is not contrary to law.[9]

[33] Affirmed.

[34] Baker, J., and Bradford, J., concur.

---

[9] Reno asserts on appeal that "There was little or no concern for the damage done to Reno because he did not record his Sheriff's Deed." *Appellant's Br.* at 19. We are not unsympathetic to Reno's frustration associated with the five years of litigation over the Property, but we disagree that there was "no concern" for his interests. The Hamiltons agreed to convey a strip of land in fee simple to Reno for him to use for his driveway, and they agreed to have the necessary survey prepared at their expense, which the trial court incorporated into its order.