## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 24 2019, 7:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darin Higgs
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Scott L. Tyler
Natalie Short
Waters, Tyler, Hofmann & Scott, LLC
New Albany, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tammy Webber,

*Appellant-Plaintiff,*

v.

Kenneth Kuebler Heating & Air Conditioning, Inc.,

*Appellee-Defendant.*

October 24, 2019

Court of Appeals Case No.
19A-CT-274

Appeal from the Posey Superior Court

The Honorable Keith A. Meier, Senior Judge

Trial Court Cause No.
65D01-1707-CT-267

**Mathias, Judge.**

[1]     Tammy Webber ("Webber") appeals the judgment of the Posey Superior Court in favor of Kenneth Kuebler Heating & Air Conditioning, Inc. ("Kuebler") in

Webber's negligence action against Kuebler. On appeal, Webber claims that the trial court clearly erred by concluding that Kuebler was not negligent per se.

[2] We affirm.

## Statement of Facts

[3] In 2014, Webber hired Kuebler to install a new air-conditioning unit in her home in Posey County, Indiana. Kuebler installed the unit on July 8, 2014, replacing an aging unit that had been in the house for decades.

[4] Three years later, in April 2017, Webber replaced the vinyl flooring in the utility room where the air-conditioning unit was located alongside her washing machine, water heater, and freezer. When she removed the flooring, she noticed that the subfloor had water damage. Webber believed that some of this water damage was caused by a clog in the drain for her washing machine. This clog apparently occurred in July 2014, when Webber did some laundry for a neighbor who had a fire in her house. The neighbor's laundry contained cinders which clogged the washing machine drain. Webber did not discover this clog until she removed the vinyl flooring. Webber replaced the damaged subflooring around the washing machine. Webber also found additional water damage to the subflooring, which she attributed to the air-conditioning unit installed by Kuebler.

[5] On July 25, 2017, Webber filed her complaint against Kuebler, alleging breach of contract, negligence, unjust enrichment, and fraudulent inducement. A bench trial was held on August 1, 2018. The trial court entered findings of fact

and conclusions of law on December 6, 2018, finding in favor of Kuebler on all counts. The trial court's extensive findings and conclusions provide in pertinent part:

> 8. Kuebler is a small company in the business of maintaining and installing heating and air systems since 1980. It is owned and operated by Kenneth, who had installed his first furnace in 1960 and who had installed as many as 150 units in one year.
>
> 9. [Webber] had known Kenneth for several years prior to the events alleged in her Complaint and Kuebler had serviced [Webber]'s old air handling system which came with the house— which [Webber] believed to be original to the house.
>
> 10. In early to mid-2014, [Webber] called Kuebler regarding a problem with the original air handler unit, which was located in the utility room.
>
> **ACQUISITION OF THE UNIT:**
>
> 11. Kenneth suggested [Webber] replace the old air handling unit to save on energy bills and avoid increasingly frequent servicing of the old unit. [Webber] agreed to purchase a new unit from Kuebler for $6,418.00
>
> * * *
>
> 15. The unit installed by Kuebler is a "down flow" configuration and consists of several basic components which, starting towards the top of the unit and going down are: the A-coil (also called an evaporator, is used to transfer heat from inside the home to the outside of the home) is toward the top of the unit; a condensate drip pan is located below the A-coil and above the blower and plenum and is used to catch condensation from the A-coil; a blower is located below the A-coil; the plenum (also referred to in the evidence as the transition or supply plenum) is located at the base of the unit at the floor and is used to connect the unit to the duct work below it in the crawl space. There is also a plastic drain line connected to the drip pan which drains water from the pan to outside the house.

16. Kenneth and two of Kuebler's employees installed the unit on or about July 8, 2014 in the same location in the utility room as the original unit. The installation included a modification made by Kuebler which included fabricating a short plenum to adapt to the existing plenum in the floor to support the coil and the unit. The plenum was screwed to the floor to secure the unit rather than being connected directly to the metal ductwork, leaving the subfloor protruding into the ductwork. Silicone was placed under the plenum to stop air leaks which could cause condensation if air leaked. When he was initially installing this unit, he saw the subfloor but did not remember what it looked like, yet he also testified that he saw no damage to the edge of the sub-flooring when the new plenum was installed and testified he would probably see damage if it were there but did not know if the floor looked like the damage shown in Exh. 19.

17. The laundry room floor was not level, but the evidence did not support a finding as to what caused the floor to be unlevel nor the extent and effects of that condition (except as specifically set forth herein).

18. Kenneth did not review the manufacturer installation instructions prior to this job because he felt he was familiar with them. The evidence appeared to be in conflict. The [e]vidence did not specifically disclose whether he had previously installed this particular model and, if he had, the date he last reviewed the instructions. *Because the floor was not level, Kenneth installed the unit tilting to the front although the manufacturer specified the unit was to be level. He did not normally install an air handler which was not level because of possible water leakage from the drip pan. He was not concerned, however, because the tilt was to the front, where the pan is located*, but admitted this style could cause condensation.

19. The original plenum was located under the home. Kenneth never checked the temperature of the unconditioned plenum to make sure it would not cause condensation. He did not insulate the plenum which he had added to the unit because it was in a conditioned area although the crawl space under the unit was unconditioned space. He estimated the cost to insulate the plenum would be $5.00 to $10.00.

20. [Webber] was pleased with the new unit unit's energy efficiency and its ability to heat and cool her home. She did not

experience any malfunctions with the unit and had no complaints about how it worked. It lowered her utility bills, as Kenneth had predicted.

21. The utility room shares walls with the kitchen, guest bedroom, and living room and has one exterior wall. Since Kuebler's installation of the unit, [Webber]'s utility room has housed the unit and deep freeze next to each other on one wall, which separated it from the kitchen where the stove and refrigerator were located behind the unit and the washing machine, dryer and water heater on the opposite wall. All appliances in the utility room were removed to perform the work but the evidence did not disclose where they were stored (except the unit was stored on the porch) during the floor replacement nor whether any repairs or modifications were made to them.

22. In July 2014 [Webber]'s neighbor had a fire and [Webber] laundered 32 to 35 loads of their clothing using her washing machine in her utility room. Unbeknownst to [Webber] at that time, the cinders from the clothing accumulated in the overflow drain from the washing machine and solidified over time, clogging the drain. The evidence did not clearly disclose whether this was before or after the installation of the unit by Kuebler[.]

**FUNKS CARPET:**

23. The utility room floor had been covered with vinyl flooring since the purchase of the house. Generally, there were two flooring layers below the vinyl floor—a particle board as the upper layer and plywood beneath. In the corner, where the deep freeze was located, there was plywood but no particle board, although the evidence did not support the reason for that condition. The floor joists were under the plywood.

24. Although the evidence did not state why, in April of 2017, [Webber] hired a local flooring company, Funks Carpet and Warehouse ("Funks"), to replace all of the vinyl flooring in the utility room. The evidence was not clear as to whether or not the entire floor area was covered with vinyl and, if not, exactly which areas were covered with vinyl. There was not sufficient evidence to determine the condition of the existing vinyl floor such as whether or not it had any tears, holes, significant wear or scuffing, etc. where water could have flowed on top of the vinyl

and then seeped through the holes or tears to the subfloor and then to other areas of the room.

25. When the Funks' employees began removing the old vinyl flooring, they discovered water damaged subflooring and black mold. It was only then that [Webber] realized water had been leaking into the utility room subfloor from the clogged washing machine drain and the subfloor under and around the washing machine had been damaged from the water leakage. [Webber] did not know how long the water stains had been on the subfloor because they were covered by the vinyl flooring.

26. The evidence was not clear as to when, but [Webber] had seen water on the linoleum twice and removed it but did not investigate the floor for damage and she did not know how many times the washing machine had overflowed onto the floor.

## MIKE MORROW:

27. [Webber] hired [a] contractor, Mike Morrow, to remediate the water damage caused by the clogged washing machine drain and to replace the damaged subfloor. Morrow inspected the damage and noted that "the subfloor" was saturated with water from the washing machine." Morrow also discovered water-damaged subflooring around the unit which was also previously hidden by the vinyl flooring. Photographs of the subfloor show what appears to be a few inches of space between the watermark in the subflooring around the washing machine and the watermark in the subflooring near the unit. The floor crumbled when it was being removed.

## BAYLOR/GRESHAM:

28. [Webber] hired Baylor Heating & Air, a company similar to Kuebler, to remove and reinstall the unit. Baylor then re-installed the unit. When Baylor removed the unit, they placed it on [Webber]'s front porch for one to two weeks while Morrow removed, replaced and attempted to level the utility room floor and Funks laid a new vinyl floor.

29. Ethan Gresham[] ("Gresham"), a Baylor employee, performed the reinstallation work. During the reinstallation, he took additional measures to decrease the likelihood of leaking and condensation from the unit, including insulating the plenum

in the floor because it would be more likely to lessen any condensation in the duct work. He testified that it is his practice to insulate the supply plenum transition unless the air handling unit is in a conditioned space, but he was not aware of any building code or installation instruction requiring such insulation. There was no evidence suggesting that the utility room was an unconditioned space.

30. While he was there, [Webber] asked Gresham to attempt to locate the cause of the water damage. Although Gresham did not investigate to determine if the unit had been installed by Kuebler with a slight tilt toward the front side, he felt a tilt of the unit would be proper because the drip pan is located in the front and one wants any condensation water to flow to that location; however, he made sure the unit was level to prevent water drainage issues. He did not know whether the manufacturer required the unit be level but, to his knowledge, the building codes required [it].

31. Gresham gave possible causes for the water damage in [Webber]'s home:

> A.) Water coming from the unit. He did not, however, run the unit to view any condensation which may be occurring because he was simply reinstalling it, but he would have if he were attempting to rule out water damage from the unit. He noted the unit, with this style of air flow and with the A-coil above the blower, is highly prone to getting so cold that the metal will sweat with condensation. He opined that, based solely on a visual inspection of the damage around the unit, the unit's A-coil caused the water damage, although he was not sure how this occurred, or alternatively, the water damage could have been caused by a failure to insulate the plenum at the base of the unit and/or a failure to insulate the ductwork underneath the house.

> B.) Water penetrating the foundation and then seeping through the crawl space and then rising up to damage the floor because the subfloor was less than four cinder blocks off the ground. Gresham did not recall if he inspected [Webber]'s crawl space or how it looked but he would have done so if he were conducting an investigation to determine the cause of the water damage;

C.) A roof leak; and

D.) Other appliances, such as refrigerators, washing machines, freezers, and water heaters, or other causes, such as leaks from plumbing.

32. *Gresham made no effort to investigate these or alternate sources of the leak and was unaware of the clogged washing machine drain nor did he conduct any investigation to determine whether there had been other appliances located in the utility room.* When he performed the reinstallation work, the other appliances —which were previously located in the utility room—had been removed. Thus, Gresham had no opportunity to inspect those possible alternative causes of the water damage, including the leak from the washing machine drain.

33. *Gresham's opinions on the causes of the water damage lack an adequate factual foundation.* He had never been specially retained to render an opinion on water damage. He testified that in fewer than six instances during the course of repairing or replacing a unit, the customer asked him to opine as to the cause of a potentially leaky unit. In these instances he did not follow any scientific method for investigating water damage prior to rendering his opinion. He was able to ascertain the cause by turning on the unit and actually observing and identifying the water leaking or dripping from a part of that air handling unit, often the A-coil. *He acknowledged that, if the A-coil was the cause of the leak, he would have been able to observe the leak had he only turned on the unit prior to removal. Contrary to his prior practice, he admitted he did not turn on this unit before it was removed. As such, he could not determine whether, in fact, water leaked from this unit due to condensation or otherwise.* Moreover, he failed to inquire into pertinent facts, such as the age of the unit, when the unit was installed, or the condition of the previously-replaced air handling unit when it was removed. He admitted he lacked the qualifications to conduct a forensic investigation to determine the cause of the water damage, *and he failed to attempt to rule out potential causes of the water damage he had identified through his previous work experience.* Although there was no evidence suggesting he was not competent to perform the regular duties of his job, he has no education beyond high school and no training in forensics, property damage losses, or investigations of water intrusion issues. He had never testified as an expert in HVAC or

a related matter. *He admitted he would defer to the opinion of a forensic investigator as to the cause of water damage on a floor.*

34. In his experience, Gresham had seen A-coils dripping water and had seen calcium buildup in drip parts which was an indicator of water buildup from the A-coil.

35. *Gresham was unable to verify his theory that the water problem was caused by the supply plenum not being insulated.* He admitted he was not in court to testify that the way the unit was installed by Kuebler was in violation of any code or installation instruction nor that any water problem in [Webber]'s home resulted from the unit not being level.

36. The floor work and reinstallation of the unit took 44 days to complete. During that time, the home was in disarray and the living conditions were difficult.

**KENNETH:**

37. Kenneth has had to replace some flooring when replacing old air handling units. Although he recognized that drain issues are possible when an air handling unit is installed with a tilt and he did not usually install them with a tilt because water could possibly leak from the drip pan and the manufacturer had instructed the unit should be level, in this case, *the floor was not level so he installed it with a tilt to the front where the drip pan is located so it would drain better.*

38. Kenneth had never seen any air handler, similar to this unit, installed inside a house where the lack of insulation on a plenum located in a conditioned area caused moisture to escape resulting in a problem. He was aware there are different temperatures interacting in an area where conditioned and unconditioned spaces meet, which can cause condensation. He was also aware down flow air handling units, like the unit in this case, are prone to getting cold enough to create condensation around an un-[insulated] supply plenum and there is a lot of condensation running from it in the summer. In this case, he did not check the temperature of the plenum in the unconditioned area to ensure the temperature differential was not high enough to create condensation. He did not insulate the supply plenum mainly because it was located in a conditioned space.

39. After [Webber] discovered the water problems and filed a complaint, Kenneth came to her home and looked inside the unit, which was prior to Rimkus and Cammack being involved in this case. He could not see inside the plenum modification he had added to the unit to determine if there was any discoloration. *He saw no sign of moisture and the drip pan showed no evidence of overflow and he found the water mark in the pan to be way below [the] top edge of the pan. He also operated the unit for approximately 30 to 60 minutes and found no condensation in the unit nor any water running on the floor.*

40. Kenneth testified that Posey County adopted the International Residential Code, but the evidence did not indicate whether it was adopted prior to or after Kuebler installed [Webber]'s unit. It provides, in pertinent part:

> **Section M1401.1 Installation.** Heating and cooling equipment and appliances shall be installed in accordance with the manufacturer's installation instructions and the requirements of this code.
>
> **Section M1411.3 Condensate Disposal.** Condensate from all cooling coils and evaporators shall be conveyed from the drip pan outlet to an approved place of disposal. . . .
>
> **Section M1411.3.1 Auxiliary and secondary drain systems.** In addition to the requirements of Section M1411.3, a secondary drain or auxiliary drip pan shall be required for each cooling or evaporator coil where damage to any building components will occur as a result of overflow from the equipment drip pan or stoppage in the condensate drain piping. . . .

* * *

41. The "Installation Instructions" for the unit provide, in pertinent part:

> **Plenums & Air Ducts**
>
> • Plenums and air ducts should be installed in accordance with . . . all applicable local codes . . . .
>
> Unconditioned Spaces

• All duct work passing through unconditioned space must be properly insulated to minimize duct losses and prevent condensation . . . . .

### CAUTION:

**The air handler must be level to ensure proper condensation drainage. An unlevel installation may result in structural damage, premature equipment failure, or possible personal injury.**

• To ensure proper condensate drainage, the unit must be installed in a level position. . . .

• If the air handler is located in . . . a living space where damage may result from condensate overflow, an auxiliary drain line should extend from the pan to a conspicuous point and serve as an alarm indicating that the primary drain is restricted.

42. The equipment warranty on the unit provides, in pertinent part:

**Warranty effective for equipment manufactured after January 1, 2013.**

This **NORDYNE** equipment and/or **NORDYNE** accessories must be installed by a licensed or otherwise qualified dealer or contractor and must be installed in accordance with **NORDYNE'S** installation instructions and in compliance with local codes. Improper installation may endanger the occupants of the dwelling.

43. The evidence did not support a finding as to whether or not the unit was manufactured after January 1, 2013 such that the unit is covered under this warranty.

44. There would be no way to install an auxiliary drip pan under this unit because air would be flowing through that space and the pan would block the air flow.

### CAMMACK:

45. On April 26, 2017, shortly after the discovery of the damaged subflooring, Marc Cammack ("Cammack"), a Senior Consultant with Rimkus Consulting Group, personally inspected [Webber]'s

house and the damage, and conducted an investigation in an attempt to determine the cause or causes of the water damage. He was accompanied by Steve Weber, a licensed civil engineer with Rimkus and a graduate of the Rose Hulman Institute of Technology with a B.S. in Civil Engineering. Weber is registered as a Professional Engineer in 16 states, including Indiana and has extensive experience in water and flood damage. He was not called to testif[y] but he and Cammack consulted and formed a consensus opinion.

46. Cammack has a degree in Agricultural Engineering with a focus on machinery. As a registered professional mechanical engineer in five states, including Indiana, Cammack has conducted over 1000 forensic investigations in his career, with 100 or more concerning the cause of a water leak; although not necessarily related to leaks related to HVAC. He testified as an expert without objection as to his qualifications.

47. The vinyl flooring in the utility room had been removed prior to Cammack's investigation, except for under the water heater.

48. Cammack observed the water staining with black fungal growth on the subfloor where the washer had sat and noted "[t]he wood floor was severely stained where the door of the freezer would have overlain." It was across the room from where the unit had been located. Although there was a gap between that water staining and the water staining located towards the unit, he opined that the water from the washer could have migrated on the vinyl flooring towards the unit, especially if the vinyl floor ran towards the unit. There were no single photos in evidence which clearly showed the extent and exact location of the larger water stain in the area where the unit sat—either in the utility room or from underneath it in the crawlspace. Cammack also opined that the missing particle board in the corner where the deep freeze was located was consistent with a possible, prior floor problem and repair.

49. Cammack was aware there had been a deep freeze in the room but he did not investigate it for a leak because it was not in the room. The evidence did not disclose where the deep freeze was located at the time of this inspection.

50. Although Cammack noted some degradation of the particle board, with more degradation where the drain line is located than around the plenum which had been added by Kuebler, *he would have expected to see more degradation if there were a water issue.* Although there were stains in the wood floor under the unit, . . . "*there was no evidence of fresh moisture intrusion.["]*

51. During Cammack's inspection, he ran the unit for approximately 30 minutes. He noted a Delta T (difference of temperature between 2 measuring points) of approximately 18 degrees but did not explain the significance of that finding to his conclusions. *He observed the condensate drip pan in the unit did not leak and that the condensate lines carried the condensate to outside the house.* Cammack's forensic investigation also included an internal inspection of the unit while it was in operation. The A-coil was in good condition. Examination of the unit's condensate drip pan did not show signs of overflowing. It showed white stains left behind by water, but, the white line created by those water stains is near the bottom of the drip pan. *He concluded the level of water in the drip pan had never gotten very high and that the "water stains within the pan revealed typical condensate levels well below the upper-edge of the pan." He also concluded that the absence of an auxiliary drip pan did not cause water on the floor.* He inspected the blower and although there was some light speckling on it, it did not line up to the drip pan nor was there significant corrosion suggesting ongoing water leakage. *He inspected the breakers and supply wires below the blower housing and concluded that if the drip pan had overflowed, he would have had expected to see evidence thereof, but they were in good condition, very clean, had no corrosion and no water staining.* He also inspected the wiring and control board, which were also below the A-coil and drip pan. He concluded that if there were overflow, he would have expected to see some evidence of overflow, but there was none. He also looked inside the plenum and looked where the plenum was fastened to the subfloor. He observed minimal degradation of the particle board, no water staining, and no evidence of water damage. *He would have expected to see much darker coloration on the subfloor than he did if there had been a leak.* He saw no condensation from the plenum while he was conducting his inspection. He also observed some discoloration of the duct work under the house but it did not change his opinion.

52. The underside of the utility room floor, as seen from the crawl space, in the area where the washer drain and supply lines were located, showed a large amount of stain and "significant" degradation of the plywood, which was more than the degradation in other areas of the utility room. . . . *Beneath the unit there was no significant degradation of the plywood or floor joists and no evidence of old moisture damage.* He noted that if the plenum had experienced significant condensation, he would have expected to have seen some damage to the subfloor, but there was no damage. *He concluded there was no significant water intrusion in that area.*

53. Cammack found that the inside of the exterior wall of the crawl space showed water intrusion from outside the house including wet mortar joints and soil against the wall and multiple wet locations, the significance of which was that water can migrate up to the floor which can contribute to damage to the subfloor. There was also no vapor barrier below the house. He also observed erosion around the foundation.

54. Cammack noted that the original vinyl floor affected the ability to determine the cause of the water problem because the staining of the floor would not have been visible and because the degradation was not to the point where there was rot nor was the floor unsafe to the point where one would put their foot through it.

55. Cammack did not have a specific opinion as to the cause of [Webber]'s floor damage, due in part to the fact that the damaged subfloor had been covered by vinyl flooring until the Spring of 2017, coupled with the fact that other appliances were located in the utility room. *He determined the unit was not the cause of any of the water-damaged subflooring in [Webber]'s utility room.*

56. Cammack identified the following possible causes of the damage, with none of these more or less likely than another:

   A. The old unit which was replaced by Kuebler.

   B. Defrost of the deep freeze adjacent to the unit.

   C. Long time condensation from the crawl space conditions, although the evidence did not disclose whether there was water damage to the flooring in other areas of the house.

D. He could not say the washer drain leak did not cause the floor damage around the unit since the water from the clogged washing machine drain could have migrated to the subflooring around the unit.

57. *Cammack's investigation specifically ruled out the uninsulated supply plenum transition as a cause of the water damage.* His inspection of the unit revealed no evidence of leaking or condensation from the unit as installed by Kuebler. As depicted in the photograph of the supply plenum and adjacent subflooring, there was no evidence of significant condensation at the site of the plenum.

58. Cammack's "Moisture Damage Evaluation" stated:

1. *The stains on the floor of the Webber utility room were unrelated to the current air handler or its installation.*

2. The floor conditions were possibly the result of one or more of the following: leaks from the previous unit, defrost of the adjacent freezer, long-term condensation from improper crawlspace conditions, or some other unknown source.

3. Previously existing moisture stains would not have been visible until the vinyl floor covering was removed.

59. In reference to **Section M1411.3.1 Auxiliary and secondary drain systems** he noted:

The air unit installation manual recommended the same instructions for condensate drainage. The installation of the unit did not conform to the excerpts above; however, the condensate line was observed to be draining at the exterior of the building. The unit lacked the shut off noted . . . above, but there was no evidence that water ever rose to the level that it would have been activated.

60. With respect to condensation, he found and concluded:

No condensation was observed on the supply duct. No condensate drain leaks were observed. The supply ductwork was not water-stained and/or corroded as would be expected if duct sweating were the source of the floor water stains. *We concluded that the stains on the flooring were unrelated to the air handling unit or its installation.*

61. With respect to moisture in the crawlspace, he found and concluded:

> All modern building codes require the proper installation of methods to remove excess moisture vapor from the crawlspace. Vapor barriers are to be installed on the dirt floor to prevent evaporation. Properly placed and sized openings in the foundation walls are required to ventilate the crawlspace air and remove moisture vapor. External soils are required to slope away from the building and be properly drained. *None of those requirement was [sic] met in the Webber house.*

> Water drained towards the house and flowed into penetrations and cracks in the foundation walls. That water flowed at velocities and quantities to erode crawlspace soils. There were no vapor barrier or ventilation openings. Such conditions created high levels of moisture vapor in the crawlspace. The duct work and the floor framing in the crawlspace had no insulation. The lack of insulation resulted in a semi-conditioned space that would have been generally heated and cooled with operation of the house air system. Though the moisture-laden air had the potential for condensation, it likely would only in severe exterior temperature differential.

62. *Cammack did not uncover any evidence that the installation of the unit by Kuebler caused or contributed to the water problems in the subfloor.*

**DAMAGES:**

63. [Webber] alleges that Kuebler's breach of contract and/or negligence led to various expenses, including:

> $111.78 for developing photographs used as trial exhibits

> $234.00 for photo enlargements . . .

> $1,689.00 for Baylor's inspection and reinstallation of the unit

> $1,536.00 for water removal and installation of new flooring

> $74.89 for a wet/dry vacuum. The evidence was not clear whether this was a rental or purchase.

> $180.00 for laundry expenses at laundromat while repairs were made to utility room

$180.00 for mileage expenses to and from the laundromat

$191.01 Court Costs

$15,324.48 for attorneys fees

$29,521.16 TOTAL

64. [Webber] testified that Morrow had rendered two bills for the floor replacement—one related to the area around the washing machine and one for the area around the air handler. Neither of the bills were offered into evidence.

65. [Webber] and Kuebler did not discuss payment of legal fees if a dispute arose and they were not addressed in Exhibits A and B.

## MISC:

66. The evidence also did not support a finding as to the following:

    A. How long water had penetrated into the floor.

    B. Whether or not [Webber] had ever checked the condensate drain on the unit for blockage or spill-over or other maintenance items on the unit that may have disclosed developing or existing issues.

    C. Whether or not liquid was found in the duct work or the returns on the unit.

    D. Whether or not the prior unit was level.

    E. The dimensions of the utility room.

    F. Whether or not the floor was actually wet when it was being removed.

## PART IV: CONCLUSIONS THEREON

1. [Webber] has the burden of proof on her claims.

*Breach of Contract:*

2. The evidence did not support a conclusion that Kuebler breached any of its contractual obligations or that, if it did breach its contractual obligations, that the breach caused the water damage to the floor in the utility room and [Webber]'s other claimed damages.

*Negligence:*

3. Although the unit was not installed precisely according the manufacturer's installation instructions and the residential building code, *the evidence did not support the conclusion that the water damage to the floor in the utility room and [*Webber*]'s other claimed damages resulted from installation of the unit.*

4. The evidence was sufficient to support the conclusion that [Webber] suffered losses an[d] expenses—*but they were not the result of Kuebler's negligence.*

*Misc:*

5. The evidence does not support a conclusion that [Webber] met her burden of proof on her claims nor that she should recover from Kuebler under either cause of action for negligence or breach of contract.

6. Kuebler is not responsible for [Webber]'s damages and losses.

*Damages and Attorney Fees:*

7. Because the evidence does not support the conclusion that Kuebler's installation of the unit was the responsible cause of the water damage to [Webber]'s floor, under either breach of contract or negligence, the court cannot award damages or attorney fees.

## PART V: JUDGMENT

**IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED** that the above Findings of Fact and Conclusions Thereon are incorporated herein as the Order and Judgment of this court without further enumeration.

**IT IS FURTHER CONSIDERED, ORDERED, ADJUDGED, AND DECREED** that based on the above Findings of Fact and Conclusions Thereon, the Court finds in favor of the Defendant, Kenneth Kuebler Heating & Air Conditioning, Inc, on Counts 1 and 2 and against Plaintiff.

Appellant's App. pp. 18–30 (record citations and footnotes omitted) (bold and underline in original, italic emphasis added). Webber now appeals.

## I. Timeliness of Webber's Appeal

[6] The first issue we address is Kuebler's argument that Webber's appeal is untimely. As stated above, the trial court entered its final judgment on December 6, 2018. Webber therefore had until January 7, 2019[1] to file a notice of appeal or file a motion to correct error. *See* Ind. Appellate Rule 9(A) ("A party initiates an appeal by filing a Notice of Appeal with the Clerk (as defined in Rule 2(D)) within thirty (30) days after the entry of a Final Judgment is noted in the Chronological Case Summary."); Ind. Trial Rule 59 ("The motion to correct error, if any, shall be filed not later than thirty (30) days after the entry of a final judgment is noted in the Chronological Case Summary.").

[7] On December 28, 2018, Webber filed a motion with the trial court seeking a thirty-day extension of the time limit to file a notice of appeal. The trial court denied this motion on January 1, 2019, correctly explaining that Appellate Rule 9 does not permit a trial court to extend the time limits to file a notice of appeal.[2] *See Tarrance v. State*, 947 N.E.2d 494, 496 (Ind. Ct. App. 2011) (noting that "'no provision of the appellate rules permits trial courts to expand the time

---

[1] Thirty days from December 6 is January 5. But in 2019, January 5 was a Saturday. Thus, the notice of appeal was not due until the following Monday, January 7.

[2] Indiana Trial Rule 72(E) does provide that, if service of a copy of a court's entry is not evidenced in the CCS, the court, "upon application for good cause shown, may grant an extension of any time limitation within which to contest such ruling, order or judgment to any party who was without actual knowledge, or who relied upon incorrect representations by Court personnel."). Here, the trial court's final judgment was evidenced by a note in the CCS. *See* Appellant's App. pp. 11–12. Trial Rule 72(E) is therefore inapplicable.

limit prescribed by Appellate Rule 9.'") (quoting *Sewell v. State*, 939 N.E.2d 686, 687 (Ind. Ct. App. 2010)).[3]

[8]     Instead of filing a notice of appeal by January 7, 2019, Webber filed, on January 3, 2019, what she styled as a "Motion for Relief From Judgment to Correct Error Pursuant to Trial Rule 60(B)." Appellee's App. p. 5 (capitalization altered).[4] In this motion, Webber sought to "correct errors regarding the judgment entered on December 6, 2018, pursuant to Ind. Trial Rule 60(B)(1), due to a mistake having a prejudicial impact on the Plaintiff . . . ." *Id*. at 5. Kuebler filed a response to Webber's motion on January 8, 2019, and, on January 18, 2019, the trial court denied Webber's motion. The trial court's order stated, "Plaintiff's Motion should be denied—both as a motion for relief from judgment under Trial Rule 60 and as a motion to correct error under Trial Rule 59." Appellant's App. p. 36. Webber filed a notice of appeal on February 6, 2019, sixty-two days after the trial court entered its final judgment but only nineteen days after the trial court denied Webber's post-judgment motion.

[9]     The timeliness of Webber's appeal depends upon whether her post-judgment motion was a motion for relief from judgment under Trial Rule 60(B) or a motion to correct error under Trial Rule 59. If a party timely files a motion to

---

[3] We note that *Sewell* was subsequently abrogated on other grounds by our supreme court in *In re Adoption of O.R.*, 16 N.E.3d 965, 971 (Ind. 2014), which held that the failure to timely file a notice of appeal results in forfeiture of the right to appeal but does not deprive the court on appeal of jurisdiction.

[4] The following day, Webber filed an identical motion that had also been signed personally by Webber. Appellee's App. pp. 8–10.

correct error under Trial Rule 59, then "a Notice of Appeal must be filed within thirty (30) days after the court's ruling on such motion is noted in the Chronological Case Summary or thirty (30) days after the motion is deemed denied under Trial Rule 53.3, whichever occurs first." Ind. Appellate Rule 9(A).

[10] However, there is no similar provision for extending the time in which a party must file a notice of appeal following a motion for relief from judgment under Trial Rule 60(B). *See In re Paternity of P.S.S.*, 934 N.E.2d 737, 740 (Ind. 2010) (holding that the propriety of a trial court's order can only be challenged by way of a timely notice of appeal or a timely motion to correct error) (citing App. R. 9(A)(1)). Indeed, it is well settled that "a motion for relief from judgment under Indiana Trial Rule 60(B) is not a substitute for a direct appeal." *Id.* (citing *Gertz v. Estes*, 922 N.E.2d 135, 138 (Ind. Ct. App. 2010)). "'Trial Rule 60(B) motions address only the procedural, equitable grounds justifying relief from the legal finality of a final judgment, not the legal merits of the judgment.'" *Id.* (quoting *Mid-West Fed. Sav. Bank v. Epperson*, 579 N.E.2d 124, 129 (Ind. Ct. App. 1991)).

[11] Here, Kuebler argues that Webber's post-judgment motion should be considered a motion for relief from judgment, not as a motion to correct error. Kuebler notes that Webber cited Trial Rule 60(B)(1) as the basis for her motion and made no mention of Trial Rule 59.

[12] But Webber also ambiguously titled her motion a "motion for relief from judgment *to correct error*." Appellee's App. p. 5 (emphasis added). Moreover, the grounds for relief listed in the motion were:

1. Defendant's acts and/or omissions by Defendant were the proximate cause of damages to Plaintiff's home, in that Kenneth Keubler stated in his deposition (among other statements) to the effect that he, in fact, did make a mistake when installing Plaintiff's air unit.

2. Kenneth Keubler agreed in his testimony that the damage to Plaintiff s floor could have been caused by Defendant's acts/omissions, as follows: a. condensation which rotted out Plaintiff's floor was caused by Defendant's failure to insulate the supply plenum; b. the unit was not level when it was installed, which caused the A-coil to drain out onto Plaintiff's floor.

3. Kenneth Keubler stated that the air unit was not level (and/or that he did not check whether it was level) after the installation, which is against applicable building codes that Defendant must follow.

4. Petitioner's witness, Ethan Gresham, was not viewed by the Court as an expert witness, although the Court should have due to Mr. Gresham's years of experience and also a certification in HVAC, and therefore, Mr. Gresham is an expert witness, due to his expert knowledge in HVAC that an ordinary lay witness would not have.

5. Kenneth Keubler testified that he did not read the installation instructions prior to the unit's installation.

6. Plaintiff s witness, Mike Morrow, had an illness, which kept him from being deposed or being a witness at the trial.

Appellee's App. pp. 5–6.

[13] None of these claims for relief allege any mistake, surprise, or excusable neglect as set forth in Trial Rule 60(B)(1) as grounds for relief from judgment. Instead, they simply allege error in the trial court's judgment. Therefore, despite the fact

that Webber's post-judgment motion refers to Trial Rule 60(B), the substance of her motion was to correct alleged error in the trial court's judgment. We therefore consider Webber's post-judgment motion to be, in substance, a motion to correct error, which acted to extend the time within which Webber had to file her notice of appeal. *See Hubbard v. Hubbard*, 690 N.E.2d 1219, 1221 (Ind. Ct. App. 1998) (declining to favor form over substance and treating appellee-respondent's motion, captioned as a motion to reconsider, as a motion to correct error).

## II.   *Negligence*

[14]   Turning to Webber's claims, she argues that the trial court clearly erred by failing to conclude that Kuebler was negligent per se because of his failure to install the air-conditioning unit pursuant to the applicable Posey County residential building codes.

### A.  *Standard of Review*

[15]   The parties requested that the trial court enter findings of fact and conclusions of law. Accordingly, on appeal we

> determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake

has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied*.

[16] Additionally, as the party who bore the burden of proof, Webber appeals from a negative judgment. *See Smith v. Dermatology Assocs. of Fort Wayne, P.C.*, 977 N.E.2d 1, 4 (Ind. Ct. App. 2012). On appeal, we will reverse a negative judgment only if it is contrary to law. *Id.* In determining whether a judgment is contrary to law, we consider only the evidence in the light most favorable to the appellee, together with all the reasonable inferences to be drawn therefrom. *Id.* The party appealing from a negative judgment must demonstrate that the evidence points unerringly to a conclusion other than that reached by the trial court. *Id.*

[17] Our supreme court recently explained the difference between the clearly-erroneous standard and the negative-judgment standard as follows: "In [the former], the inquiry is essentially whether there is **any** way the trial court could have reached its decision. In the [latter], it is whether there is **no** way the court could have done so." *Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597, 602 (Ind. 2019) (citation and internal quotation marks

omitted) (emphasis in original).[5] It is under this limited standard that we review Webber's claims of error.

*B. Negligence Per Se*

[18]    "The unexcused or unjustified violation of a duty proscribed by a statute or ordinance constitutes negligence *per se* if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation." *Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 704 (Ind. Ct. App. 2004), *trans. denied* (citing *Town of Montezuma v. Downs*, 685 N.E.2d 108, 112 (Ind. Ct. App. 1997), *trans. denied*). For the violation of a statute or ordinance to constitute negligence per se, the trier of fact must first determine whether the statute or ordinance is applicable. *Id.* (citing *Dawson ex rel. Dawson v. Long*, 546 N.E.2d 1265, 1268 (Ind. Ct. App. 1989), *trans. denied*). If the statute or ordinance is applicable, the trier of fact must determine whether a violation of the statute or ordinance occurred. *Id.* If there was such a violation, the question then becomes whether the violation proximately caused the plaintiff's injury. *Id.* "Negligence per se supplies liability, but the plaintiff must still prove causation and damages just as in any other negligence claim." *Id.* (citing *City of Gary ex rel. King v. Smith & Wesson, Corp.*, 801 N.E.2d 1222, 1245 (Ind. 2003)).

---

[5] Our supreme court observed that the distinction between the clearly-erroneous standard and the negative-judgment standard is "[a]rguably . . . a distinction without a difference." *Id.* (citation and internal quotation marks omitted).

[19]     Here, Webber contends that there was clear evidence that the building code applied, that Kuebler violated this ordinance, and that her damages resulted from this violation. Kuebler contends that Webber waived any reliance upon the doctrine of negligence per se by failing to include such a claim in her complaint and by failing to argue such before the trial court.

[20]     Even if we were to assume that negligence per se applied under these facts and circumstances, Webber would not prevail, as there was ample evidence supporting the trial court's conclusion that the air-conditioning unit as installed by Kuebler did not proximately cause the damage to Webber's flooring. Kenneth testified that he found no evidence of moisture in the unit, did not find any signs of an overflow in the drain pan, and did not see any condensation when he ran the air conditioner. Cammack's extensive investigation also found no evidence that the air-conditioning unit installed by Kuebler contributed to the damage to Webber's flooring. Webber's appellate argument is little more than a request that we consider the evidence favoring her claim, disregard the evidence favoring the trial court's judgment, and come to a conclusion opposite that reached by the trial court. This is not within our prerogative as an appellate court.

## Conclusion

[21]     Because Webber's post-judgment motion was, in substance, a motion to correct error, her notice of appeal was timely filed. And even assuming that Kuebler's installation of the air-conditioning unit in Webber's home was contrary to the controlling ordinance and constituted negligence per se, there was still evidence

from which the trial court, acting as the trier of fact, could conclude that the manner in which Kuebler installed the unit did not proximately cause the damage to Webber's flooring. Accordingly, we affirm the judgment of the trial court.

[22] Affirmed.

May, J., and Brown, J., concur.